United States District Court
Southern District of Texas
**ENTERED**
June 29, 2016
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| BILLY JOE HARRIS,<br>TDCJ #1740160, | § | |
| | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. V-15-0034 |
| | § | |
| LORIE DAVIS, Director, | § | |
| Texas Department of Criminal Justice - | § | |
| Correctional Institutions Division,[1] | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER

The petitioner, Billy Joe Harris (TDCJ #1740160), is currently incarcerated in the Texas Department of Criminal Justice – Correctional Institutions Division ("TDCJ"). Harris has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254, challenging a state court conviction. The respondent has filed a motion for summary judgment, arguing that Harris is not entitled to relief [Doc. # 17]. Harris has not filed a response and his time to do so has expired. Instead, Harris has filed a motion for leave to amend his petition to add new claims [Doc. # 18]. After reviewing all of the pleadings, the state court records, and the applicable law, the Court denies Harris's request for leave to amend, grants the respondent's motion, and dismisses this case for reasons set forth below.

---

[1]     Effective May 1, 2016, Lorie Davis succeeded William Stephens as Director of the Texas Department of Criminal Justice - Correctional Institutions Division. Accordingly, Davis is automatically substituted as the respondent pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

## I.   <u>BACKGROUND</u>

Harris challenges his conviction for aggravated sexual assault of a disabled person in state court cause number 11-1-8527.[2]  Harris entered a plea of "not guilty by reason of insanity" in that case.[3]  A jury in the 24th District Court of Jackson County, Texas, found him guilty as charged and sentenced him to life imprisonment.[4]  For purposes of analyzing Harris's claims, the Court has summarized the state court proceedings associated with the challenged conviction.[5]

### A.   Pretrial Proceedings

The charges against Harris garnered a significant amount of publicity in Jackson County and the surrounding area.[6]  The media dubbed Harris the "Twilight Rapist" after he was named as a suspect in the rapes of more than a dozen elderly women in Central Texas.[7]  To determine whether a change of venue was required, defense counsel placed an advertisement in the local paper asking readers to provide an opinion about whether the Twilight Rapist could get a fair trial in Jackson County.[8]  Defense counsel ultimately did not file a motion for a change of venue, but both sides

---

[2]   Petition for a Writ of Habeas Corpus by a Person in State Custody ("Petition") [Doc. # 1], at 2.

[3]   Notice of Intent: Insanity Defense [Doc. # 4-18], at 4;  Reporter's Record, vol. 4 [Doc. # 5-15], at 14.

[4]   Judgment of Conviction by Jury [Doc. # 5-5], at 5.

[5]   The voluminous state court record has been submitted in multiple parts located at Docs. # 4 through # 11.  For purposes of identification, the Court refers to portions of the record by docket entry and electronic page number as shown on CM/ECF.

[6]   Reporter's Record, vol. 2 [Doc. # 5-11], at 12.

[7]   *Id.*;  Reporter's Record, vol. 6 [Doc. # 6-11], at 82.

[8]   Reporter's Record, vol. 2 [Doc. # 5-11], at 9-18, 23.

questioned the panel of proposed jurors during voir dire about pretrial publicity that they may have seen or heard.[9]

Because of his repeated outbursts in court,[10] the trial judge entered a *sua sponte* order that required Harris to wear a remotely controlled "Bandit" restraint system during all court proceedings.[11]  Defense counsel objected, citing concerns for his safety, and further asked that any restraints be discretely employed in front of the jury due to their prejudicial nature.[12]  Because of Harris's record of disruptive behavior, the trial court found that restraints were warranted at trial and defense counsel conceded that they were necessary.[13]  In light of Harris's repeated verbal outbursts, the trial court also prepared as an alternative option a "room for him to sit where he can watch" the proceedings from a "[live] feed from five cameras" in the courtroom in the event that he had to be removed.[14]

### B.    Harris's Trial

The State presented evidence that the victim, Catherine Wiegand, reported a burglary on December 5, 2010, in which her laptop and printer were taken from her residence at an apartment complex for elderly disabled individuals in Edna, Texas.[15]

---

[9]    Reporter's Record, vol. 3 [Doc. # 5-13], at 80-82; [Doc. # 5-14], at 13-14, 16-18.

[10]    Reporter's Record, vol. 3 [Doc. # 5-13], at 8-9.

[11]    *Id*.;  Notice of Sua Sponte Order [Doc. # 4-18], at 2.

[12]    Objection Regarding Bandit Restraint System [Doc. # 4-18], at 3.

[13]    Reporter's Record, vol. 3 [Doc. # 5-13], at 4-9.

[14]    *Id.* at 5.

[15]    Reporter's Record, vol. 4 [Doc. # 5-15], at 54-55 (testimony of City of Edna Police Officer Luis Chavez).

3

Wiegand also discovered that her phone had been unplugged or disconnected during the burglary.[16]  Also missing was a key to the front door of her residence.[17]

Wiegand testified that she was disabled from multiple back surgeries and required the use of a walker.[18]  During the early morning hours of January 8, 2011, Wiegand heard a loud crash in her living room.[19]  When she got up to investigate, a man grabbed her from behind.[20]  She struggled with him and tried to reach the phone.[21]  As he moved her to the couch Wiegand began to pray.[22]  She told her assailant that she was disabled and begged him to leave her alone because she had five rods and ten screws in her back.[23]  Her attacker sexually assaulted her by penetrating her vagina and then by forcing her to perform oral sex.[24]  Wiegand struggled with her attacker, scratching his chest.[25]  She testified that she had never met her attacker before and that the encounter was definitely not consensual.[26]  After he was done he

---

[16]     *Id.* at 61 (testimony of Edna Police Officer Craig Repka).

[17]     *Id.* at 62.

[18]     *Id.* at 106.

[19]     Reporter's Record, vol. 4 [Doc. # 5-16], at 2.

[20]     *Id.* at 3.

[21]     *Id.*

[22]     *Id.*

[23]     *Id.* at 5.

[24]     *Id.* at 6-7.

[25]     *Id.* at 8.

[26]     *Id.* at 11.

wanted to know if she had any money.[27]   At some point, Wiegand was able to pull an emergency cord in her apartment, which had a silent alarm that was used to summon Emergency Medical Service ("EMS") and the police.[28]

Officer Michael Yaws of the City of Edna Police Department was on patrol with Officer Robert Chastain during the early morning hours of January 8, 2011, when they overheard a medical alert call go out to EMS.[29]   The officers decided to respond to see if EMS needed help.[30]   When they arrived the officers noticed a screen missing from a window.[31]   When they knocked on the door and announced that they were police, a female voice yelled out "Help me"  and "He's in here with me."[32]   At that point, the officers determined that someone was in the apartment with the female victim.[33] As officers struggled to gain entry, a black male exited the front door.[34]   The man fled and the officers gave chase, attempting to hit him with a taser and catching him eventually after a struggle.[35]   The officers noticed that he was wearing latex

---

[27]     *Id.* at 5.

[28]     *Id.* at 8.

[29]     Reporter's Record, vol. 4 [Doc. # 5-15], at 90-93.

[30]     *Id.* at 94.

[31]     *Id.* at 99.

[32]     *Id.*

[33]     *Id.*

[34]     *Id.* at 101.

[35]     Reporter's Record, vol. 4 [Doc. # 5-16], at 18-24, 48-51.

gloves and black clothing, but no shoes.[36]  Officer Chastain identified Harris as the
man they apprehended that night.[37]

Texas Rangers were called in to investigate along with the Texas Department
of Public Safety and the Edna Police Department.[38]  They recovered a pry bar, a small
bottle of lubricant, a pair of latex gloves, a pair of gray men's underwear, and a pair
of athletic shoes from the victim's living room.[39]  Officers located Harris's vehicle
parked nearby behind a vacant building.[40]  A search of the vehicle revealed Harris's
work uniform, wallet, cell phone, and latex gloves.[41]  The victim's phone had been
unplugged and the bulb had been unscrewed from the porch light over the front door.[42]
A subsequent search of Harris's residence turned up the victim's laptop and printer,
which had been stolen from her home a month before the sexual assault occurred.[43]

A key from Harris's key chain was identified as the same key that was reported
stolen from her residence.[44]

---

[36]     *Id.* at 26, 31, 36.

[37]     *Id.* at 47.

[38]     *Id.* at 60-61.

[39]     *Id.* at 66-70.

[40]     *Id.* at 28-29.

[41]     *Id.* at 76-78.

[42]     *Id.* at 73-74, 82-83.

[43]     *Id.* at 97-98, 101;  Reporter's Record, vol. 5 [Doc. # 5-17], at 9-11, 15-16.

[44]     Reporter's Record, vol. 5 [Doc. # 5-17] at 55-56.

The paramedic who treated the victim on the night of the sexual assault testified that she was distraught.[45]  The victim reported that she had been sexually assaulted and was transported to the local hospital.[46]

At the hospital the victim was examined by a "Sexual Assault Nurse Examiner" or SANE nurse.[47]  The nurse performed a head to toe assessment after the victim described being sexually assaulted.[48]  The nurse documented injuries that were consistent with being sexually assaulted.[49]  A nurse also examined Harris, taking photographs of scratches on his chest and collecting a sample of his DNA.[50]

Harris's second wife, Darlene, testified that Harris left their home late on the evening of January 7, 2011, already wearing his work uniform, telling her that he was picking up extra hours before his regular shift started at 5:30 a.m. on January 8.[51]  Anticipating Harris's insanity defense, the prosecution asked Darlene if she ever observed any abnormal or unusual behavior on Harris's part during their marriage.[52]

---

[45]     Reporter's Record, vol. 5 [Doc. # 5-17], at 27.

[46]     *Id.* at 27-28.

[47]     *Id.* at 44.

[48]     *Id.* at 45-46.

[49]     *Id.* at 49-52.

[50]     *Id.* at 30-39, 40.

[51]     *Id.* at 67-69.

[52]     *Id.* at 71.

She replied that she had not and described Harris as a loving man with a stable work history who was a good role model for her son.[53]

Texas Ranger Troy Wilson testified that Harris made an oral statement, which was transcribed and played for the jury, following his arrest.[54]  In that statement, Harris said that he and the victim were "dating," although he did not know her name.[55] He admitted having sex with the victim.[56] Harris explained that he was wearing gloves when he was apprehended because the victim had a cat and he did not want to touch anything.[57]  He was reluctant to give DNA, because the sex was consensual.[58]

Harris, who was employed by TDCJ as a food service supervisor at the time of his arrest, testified on his own behalf and attempted to raise insanity as a defense.[59] Harris testified that he was sexually abused by a female music teacher at the age of 13, which caused him to engage in deviant sexual activity with farm animals and to develop other personalities.[60]  Harris, who was married to his first wife for over twenty years, also described having a sexual relationship with his pet dogs.[61]  Harris testified further that he believed extraterrestrial aliens took one of his testicles while

---

[53]    *Id.* at 78.

[54]    *Id.* at 81-83.

[55]    Reporter's Record, vol. 34 [# 9-18], at 43.

[56]    *Id*. at 61-63.

[57]    *Id*. at 92.

[58]    *Id.* at 95.

[59]    Reporter's Record, vol. 6 [Doc. # 5-18], at 16-18.

[60]    *Id.* at 27-29, 35-40.

[61]    *Id.* at 51-52, 55.

he was in the Army and that he suffered from post-traumatic stress disorder ("PTSD") from having combat duty during Operation Desert Storm.[62]

On cross-examination, Harris admitted that he had never told anyone about having multiple personalities or mental difficulties and had never exhibited symptoms of mental illness before charges were lodged against him in this case.[63]  Medical records showed that Harris's left testicle was surgically removed while he was in the Army due to a hernia.[64]  Harris's military records showed that he never served in combat while in the Army, where he served with distinction for over twenty years as a food service specialist.[65] Harris admitted that he was able to function as a normal person and employee and that there was no record anywhere of the bizarre behavior that Harris was displaying for the jury.[66]

The defense presented testimony from Dr. Walter Quijano, who is a licensed clinical psychologist with thirty years' experience.[67] Dr. Quijano was retained to do an examination to determine whether Harris was mentally ill.[68]  After examining Harris for about six hours, Dr. Quijano determined that Harris was legally competent

---

[62]    *Id.* at 61-62.

[63]    *Id.* at 109-110.

[64]    *Id.* at 115.

[65]    *Id.* at 120-21.

[66]    *Id.* at 131-32.

[67]    Reporter's Record, vol. 7 [Doc. # 5-20], at 10, 21.

[68]    *Id.* at 14-15.

and could assist in his own defense.[69]  Dr. Quijano described Harris as grunting, stuttering and jerking throughout the interview.[70]  Dr. Quijano believed that Harris "might" have PTSD, although he was mostly in a "supportive role" during the Gulf War.[71]  When Dr. Quijano tried to question Harris about the onset of his crime spree, Harris raised the issue of other personalities, which Dr. Quijano confessed he knew little about.[72]   As a result, defense counsel retained a specialist in dissociative disorders.[73]  That expert was Dr. Colin Ross.

The prosecutor made an objection to the testimony given by Dr. Quijano and the proposed testimony by Dr. Ross regarding the general acceptance of multiple personality or dissociative identity disorder within the scientific community.[74]  The trial court took the objection under consideration and deferred a ruling until after it heard all of the expert testimony.[75]

Dr. Ross is a psychiatrist who testified for the defense as an expert on multiple personality disorder ("MPD") or dissociative identity disorder ("DID").[76]  Ross testified that he believed Harris had MPD/DID, but he also acknowledged that

---

[69]     *Id.* at 15.

[70]     *Id.* at 16.

[71]     *Id.* at 17-18.

[72]     *Id.* at 19-20.

[73]     *Id.* at 21.

[74]     *Id.* at 27-28.

[75]     *Id.* at 28.

[76]     *Id.* at 29.

MPD/DID were "highly controversial" theories,[77] and that he had no way of knowing whether Harris was lying to him during the self-assessment tests that Ross used to reach his diagnosis.[78] As evidence that Harris was fabricating his symptoms, the State presented the transcription of a recorded jailhouse phone conversation between Harris and one of his girlfriends in which Harris boasted about the "big show" he was putting on in court.[79] Dr. Ross conceded that it was "plausible" that Harris was faking his symptoms in an effort to present an insanity defense.[80]

In rebuttal, the State called Dr. Christopher Barden, who testified that MPD/DID is "the worst kind of junk science" that is not based on reliable methodology and is not generally accepted by the scientific community.[81] The State also called forensic psychiatrist Dr. Richard Coons,[82] who examined Harris to determine whether he met the legal definition of insanity, noting that he did not and concluding that Harris was probably malingering.[83]

After all of the expert testimony was presented, the State re-urged its motion to exclude the testimony of Dr. Ross and the testimony of Dr. Quijano as it applied to the

---

[77]     *Id.* at 80-81.

[78]     *Id.*

[79]     *Id.* at 30-33 (referencing State's Exhibit SX-D).

[80]     *Id.* at 32-33.

[81]     Reporter's Record, vol. 7 [Doc. # 6-1], at 34-84.

[82]     Reporter's Record, vol. 8 [Doc. # 6-2], at 9.

[83]     *Id.* at 21-22.

diagnosis of MPD/DID.[84]  The trial court granted the motion.[85]  In doing so, the trial court ordered the testimony of Dr. Ross stricken from the record and instructed the jury to disregard Dr. Ross's testimony.[86]  The trial court did not strike Dr. Quijano's testimony, but instructed the jury to disregard portions of his testimony that related to a diagnosis of MPD/DID.[87]

After hearing closing arguments, the jury rejected Harris's insanity defense and took less than fifteen minutes to find him guilty as charged of aggravated sexual assault of a disabled person.[88]

During the punishment phase of the trial, the State presented evidence showing that Harris stalked and raped, or attempted to rape, at least a dozen other elderly women in Central Texas.[89]  Similar to the offense perpetrated against Catherine Wiegand, the evidence showed that Harris broke into the women's homes by prying open a window, stealing keys and other items that were later located at Harris's residence.  Harris would later return to break into the women's homes in the middle of the night after cutting phone wires and disabling electric circuit breakers or porch lights.  Although much of the testimony was from law enforcement who linked Harris to these offenses with physical evidence, ten elderly victims who were preyed upon

---

[84]     *Id.* at 23-28.

[85]     *Id.* at 30.

[86]     *Id.*

[87]     *Id*.

[88]     *Id.* at 72-73.

[89]     The hearing on punishment lasted several days, commencing on September 22, and concluding on September 30, 2011, and is found at Reporter's Record, vols. 9-13 [Docs. # 6-3 through 6-11].

testified against Harris.[90]  Harris raped one of the elderly women twice, breaking into her home a second time after she had moved to a different residence.[91]  After hearing all of the testimony, the jury deliberated less than fifteen minutes before returning with a verdict on punishment that sentenced Harris to life imprisonment.[92]

### C.   Harris's Direct Appeal

On direct appeal Harris argued that the trial court erred by striking the testimony of Dr. Ross and limiting the testimony of Dr. Quijano regarding MPD/DID.[93]  The intermediate state court of appeals summarized all of the expert testimony at length and rejected this claim, affirming the conviction.  *See Harris v. State*, 424 S.W.3d 599 (Tex. App. — Corpus Christi-Edinburg 2013).  The Texas Court of Criminal Appeals denied Harris's petition for discretionary review on January 15, 2014.  *See Harris v. State*, No. 1184-13 (Tex. Crim. App. 2014).

### D.   Harris's State Habeas Corpus Application

Harris challenged his conviction further by filing an application for a state writ of habeas corpus under Article 11.07 of the Texas Code of Criminal Procedure.[94]  Harris raised a host of claims in that application.  Harris alleged that he was denied effective assistance of counsel prior to and during his trial because his attorney:

---

[90]   Reporter's Record, vol. 9, at 68-86 (Dorothy Gerdes); Reporter's Record, vol. 10, at 13-30 (Mary McQuillen);  101-120 (Jimmie Herren);  146-66, 192-93 (Mabel Watson); Reporter's Record, vol. 11, at 13-32, 37-38 (Martha Knight);  95-110 (Alice Reichle); 150-154 (Adela Green);  Reporter's Record, vol. 12, at 10-15 (Mary Lee Small);  30-46, 53-54 (Louise Allman);  103-06 (Lupe Medina).

[91]   Reporter's Record, vol. 9 [Doc. # 6-3], at 72-76; 81-85.

[92]   Reporter's Record, vol. 13 [Doc. # 6-11], at 84-85.

[93]   Brief of Appellant [Doc. # 10-4], at 8.

[94]   Application for a Writ of Habeas Corpus [Doc. # 11-14], at 5-21.

(a)     failed to file a motion to exclude or object to "Ref. 'Criminal Label'";

(b)     created pre-trial publicity in connection with seeking a change of venue by referring to him as the "Twilight Rapist";

(c)     failed to properly investigate or determine whether testimony proffered by the defense expert witnesses was "sufficiently relevant and adequately reliable";

(d)     failed to investigate or question the defense expert witnesses credentials and expertise with regard to MPD/DID;

(e)     failed to obtain a "pre-admission determination" outside the presence of the jury before offering scientific evidence;

(f)     failed to investigate whether Harris was entitled to an expert witness through the Veteran's Administration;

(g)     failed to file a motion for a jury finding on the issue of his competency under Article 46B.051(a) of the Texas Code of Criminal Procedure or to have an independent examination for a competency determination; and

(h)     failed to object to the trial court's directives for Harris not to remove his earplugs and to have Harris tried while hand-cuffed in the presence of the jury.[95]

Harris argued that the prosecution engaged in the following acts of misconduct:

(a)     characterizing him throughout the course of the trial as "the Twilight Rapist";

(b)     withholding or suppressing material, exculpatory evidence that was favorable to the defense;

---

[95]     *Id.* at 10-11.

(c)     using "scare-tactics" by threatening to taser/shock Harris for his irrational and bizarre behavior during trial.[96]

Harris argued that the trial court abused its discretion by:

(a)     excluding the defense expert witnesses;

(b)     failing to hold a competency hearing *sua sponte*;

(c)     denying trial counsel's request for funds to "fly in" a DNA expert for the defense;

(d)     inquire as to whether Harris was denied psychiatric or medical treatment at the Jackson County Jail.[97]

Duplicating one of his prosecutorial-misconduct claims, Harris alleged that he was subjected to "wrongful process of law" because evidence favorable to the defense was suppressed at trial.[98]  Harris alleged further that he was denied effective assistance of counsel on appeal because his appellate attorney did not raise meritorious claims of ineffective assistance of counsel concerning his trial attorney.[99]  Finally, Harris argued that the Texas Court of Criminal Appeals abused its discretion by denying his motion to exceed prescribed page limits on state habeas corpus review.[100]

Implicitly finding that Harris failed to raise any meritorious issues, the trial court transferred the state habeas corpus application to the Texas Court of Criminal

---

[96]     *Id.* at 12.

[97]     *Id.* at 13.

[98]     *Id.* at 16.

[99]     *Id.* at 18.

[100]     *Id.* at 19.

Appeals without any findings or conclusions of law.[101]  On May 16, 2015, the Texas Court of Criminal Appeals summarily denied relief without a written order.[102]

### E.    Harris's Federal Habeas Petition

In his pending federal habeas corpus petition Harris raises the same claims that were presented in his state habeas corpus application.[103]  The respondent moves for summary judgment, arguing that the petition must be dismissed because Harris is not entitled to relief.  Harris has not filed a response to the respondent's motion.  Instead, he has filed a motion for leave to amend the petition to include new allegations of ineffective assistance of counsel and prosecutorial misconduct.  He has not provided a separately filed amended petition.  The motion for leave to amend will be denied for reasons explained after the Court has considered the original petition under the governing federal habeas corpus standard of review.

## II.    **STANDARD OF REVIEW**

All of the claims presented in Harris's petition [Doc. # 1] were denied by the Texas Court of Criminal Appeals on state habeas corpus review, which constitutes an "adjudication on the merits."  *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000), Therefore, the petition is subject to review under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2254(d).  The AEDPA standard applies even in cases where, as here, the state court does not cite authority or issue findings providing the reasons for denying relief.  *See Early v. Packer*, 537 U.S. 3, 7 (2002); *see also  Harrington v. Richter*, 562 U.S. 86, 98-99

---

[101]    Clerk's Certificate under Article 11.07, § 2(c) [Doc. # 11-15], at 66.

[102]    Action Taken on Writ No. 80,329-03 [Doc. # 11-13], at 1.

[103]    Petition [Doc. # 1], at 6-10.  The Petition includes a Memorandum of Law in Support ("Petitioner's Memorandum") [Doc. # 1-1], at 1-16.

(2011) (confirming that "§ 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits'").

Under the AEDPA standard, a federal habeas corpus court may not grant relief unless the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.] 28 U.S.C. § 2254(d)(1). "A state court's decision is deemed contrary to clearly established federal law if it reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts." *Matamoros v. Stephens*, 783 F.3d 212, 215 (5th Cir. 2015) (citations omitted); *see also Williams v. Taylor*, 529 U.S. 362, 404-08 (2000).  To constitute an "unreasonable application of" clearly established federal law, a state court's holding "must be objectively unreasonable, not merely wrong; even clear error will not suffice." *Woods v. Donald*, — U.S. —, 135 S. Ct. 1372, 1376 (2015) (quoting *White v. Woodall*, — U.S. —, 134 S. Ct. 1697, 1702 (2014)).   "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Id*. (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

The AEDPA standard "imposes a 'highly deferential standard for evaluating state-court rulings, . . . [which] 'demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citations omitted). This standard is intentionally "difficult to meet" because it was meant to bar relitigation of claims already rejected in state proceedings and to preserve federal

17

habeas review as "a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Richter*, 562 U.S. at 102-03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332, n.5 (1979) (Stevens, J., concurring)); *see also White*, 134 S. Ct. at 1702.

## III.   **DISCUSSION**

For ease of analysis, the Court will first address Harris's allegations of error by the trial court and his claims of prosecutorial misconduct before turning to the allegations of ineffective assistance of counsel and error during the course of state collateral review.

### A.     **Excluding Expert Witness Testimony**

Harris contends that the trial court abused its discretion when it excluded the expert testimony on MPD/DID.[104]  The state court of appeals rejected this claim in a published opinion.[105]  *See Harris v. State*, 424 S.W.3d 599 (Tex. App. — Corpus Christi-Edinburgh 2013).  In doing so, the state court of appeals summarized the expert testimony in great detail and determined that the trial court did not abuse its discretion because Harris failed to show that the testimony "was relevant *and* reliable and not mere 'junk science.'"  *Id.* at 607-08 (citing *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000)) (emphasis in original).

The respondent correctly notes that the state court of appeals based its decision to uphold the trial court's evidentiary ruling on state law.[106]  *See Harris*, 424 S.W.3d

---

[104]     Petition [Doc. # 1], at 8.

[105]     The respondent sets out most of the appellate court's opinion in the motion for summary judgment [Doc. # 17], at 22-35.  The Court will not repeat the lengthy appellate opinion here, but takes judicial notice of its contents.

[106]     The state court of appeals also made reference to *Daubert v. Merrell Dow*
(continued...)

at 602-08.  The Supreme Court has "repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam) (citations omitted).  Thus, federal habeas corpus courts typically "do not review state courts' application of state evidence law." *Jones v. Cain*, 600 F.3d 527, 536 (5th Cir. 2010) (citing *Castillo v. Johnson*, 141 F.3d 218, 222 (5th Cir. 1998); *Mercado v. Massey*, 536 F.2d 107, 108 (5th Cir. 1976)); *see also Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998) ("In habeas actions, this court does not sit to review the mere admissibility of evidence under state law.").  A federal habeas corpus court will not grant relief from errors in a state trial court's evidentiary rulings, if any, unless the application of a state evidentiary rule violates the United States Constitution.  *See Jones*, 600 F.3d at 536 (citing *Estelle v. McGuire*, 502 U.S. 62 (1991)); *see also Little*, 162 F.3d at 862 (noting that erroneous state evidentiary rulings merit federal habeas relief only where the errors "are so extreme that they constitute a denial of fundamental fairness").

Harris makes no effort to show that the state court of appeals erred by upholding the trial court's decision or that the expert testimony on MPD/DID was improperly excluded in violation of the Constitution.  The Fifth Circuit has repeatedly emphasized that "mere conclusory allegations do not raise a constitutional issue in a habeas proceeding." *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983) (citing *Schlang v. Heard*, 691 F.2d 796, 798 (5th Cir. 1982) (collecting cases)).  Harris's bare

---

[106](...continued)
*Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  *See Harris*, 424 S.W.3d at 601 & n. 6.  The Fifth Circuit has recognized that *Daubert*, which concerned the Federal Rules of Evidence, did not establish a constitutional standard for the admissibility of expert testimony and does not afford a basis for federal habeas corpus relief.  *See Castillo v. Johnson*, 141 F.3d 218, 221-22 (5th Cir. 1998).

assertions, without more, are not sufficient to establish error on the state court's part or to articulate a claim for relief on federal habeas review. Accordingly, he is not entitled to relief on this issue.

### B.    Failure to Hold Competency Hearing or Ensure Psychiatric Care

In two claims that appear to be related, Harris contends that the trial court erred by failing to hold a competency hearing or to ensure that Harris was receiving adequate psychiatric care at the Jackson County Jail prior to trial.[107]  The claims are without merit.

It is well established that "the Constitution does not permit trial of an individual who lacks 'mental competency.'"  *Indiana v. Edwards*, 554 U.S. 164, 170 (2008) (citations and quotation omitted).  A defendant is competent to stand trial if he has a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and has "a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam); *DeVille v. Whitley*, 21 F.3d 654, 656 (5th Cir. 1994).  A petitioner seeking habeas relief based on the trial court's failure to hold a competency hearing has the burden of showing that "objective facts known to the trial court were sufficient to raise a bona fide doubt as to his competency." *Enriquez v. Procunier*, 752 F.2d 111, 113 (5th Cir. 1984); *see also Pate v. Robinson*, 383 U.S. 375 (1966).  The petitioner's burden to prove incompetency is a "heavy" one. *See DeVille*, 21 F.3d at 656.  To prevail, a habeas petitioner must show that there are "sufficient facts to positively, unequivocally and clearly generate a real, substantial and legitimate doubt as to the mental capacity of the petitioner to meaningfully participate and cooperate with

---

[107]    Petition [Doc. # 1], at 9.

counsel during trial." *Moody v. Johnson*, 139 F.3d 477, 481 (5th Cir. 1998) (internal quotation marks omitted).

The record reflects that Harris behaved erratically prior to and during the trial, but there is no evidence that he lacked competence. Rather, the record reflects that Harris's competency was evaluated prior to trial by a defense expert (Dr. Quijano), who determined that Harris was competent.[108] In an abundance of caution, the trial court also ordered a competency examination by an independent expert, Dr. Joel Kutnick, who provided a report to the parties.[109] Harris, who testified at length in his own defense, does not allege facts showing that he was incompetent to stand trial. Harris does not otherwise show that the trial court erred by failing to ensure that he received adequate psychiatric care as a pretrial detainee.[110] Absent evidence of incompetency, Harris does not show that the trial court was obligated to hold a competency hearing or that the state court's decision to reject this claim was unreasonable. Accordingly, he is not entitled to relief on these claims.

### C.   Denying Defense Request for Funds

The record shows that the trial court granted funds for the defense to undertake independent testing of DNA evidence collected by law enforcement, which was done

---

[108]   Reporter's Record, vol. 7 [Doc. # 5-20], at 14-15.

[109]   Reporter's Record, vol. 2 [Doc. # 5-11], at 18-19; Order for Incompetency Examination [Doc. # 4-15], at 11; Invoice [Doc. # 4-16], at 7; and Notice of Filing [Doc. # 4-16], at 10.

[110]   To the extent that Harris contends that he was denied adequate care while a pretrial detainee, this type of allegation is actionable, if at all, as a civil rights claim under 42 U.S.C. § 1983. *See Cook v. Texas Dep't of Criminal Justice Transitional Planning Dep't*, 37 F.3d 166, 168 (5th Cir. 1994) (an action under 42 U.S.C. § 1983 is the appropriate legal vehicle to attack unconstitutional conditions of confinement).

by a laboratory in Utah.[111]  When defense counsel asked for additional funds to have a DNA expert travel to Texas to testify at trial, the trial court denied that request.[112] Harris contends that the trial court abused its discretion by refusing a request made by defense counsel to "fly in" an out-of-state DNA expert to testify at trial.[113]

An indigent defendant does not have an automatic right to assistance by a non-psychiatric expert upon demand.  *See Yohey v. Collins*, 985 F.2d 222, 227 (5th Cir. 1993) (noting that a defendant must show more than a "mere possibility" of assistance from the requested expert).  To prevail on a claim that he was denied an expert, a habeas petitioner must demonstrate "a reasonable probability that the requested expert[] would have been of assistance to the defense and that denial of such expert assistance resulted in a fundamentally unfair trial."  *Id.*

Harris does not present any proposed expert testimony or show how it would have benefitted his case.  Importantly, DNA evidence was not introduced or relied upon during the guilt/innocence phase of the trial because Harris did not deny having sex with the victim.  The State agreed not to present DNA evidence during the guilt/innocence phase and the trial court granted defense counsel's motion in limine to restrict mention of any DNA evidence.[114] Even without DNA evidence, the State's case against Harris was overwhelming.  Under these circumstances, Harris does not demonstrate that his trial was fundamentally unfair for lack of a DNA expert.  *See, e.g., Griffith v. Quarterman*, 196 F. App'x 237, 243-44 (5th Cir. 2006) (rejecting a

---

[111]    Reporter's Record, vol. 3 [Doc. # 5-13], at 10-11.

[112]    *Id.* at 11.

[113]    Petition [Doc. # 1], at 8.

[114]    Reporter's Record, vol. 3 [Doc. # 5-13], at 9-10, 12.

claim based on lack of access to additional expert testimony where the petitioner failed to show that it was critical to the defense); *Hines v. Cockrell*, 57 F. App'x 210, 2002 WL 31956173, * 5 (5th Cir. 2002) (rejecting a claim based on lack of access to additional DNA testing where the petitioner had not shown that there was more than a mere possibility that additional testing would produce different results). Harris does not otherwise show that the state court unreasonably denied relief on this claim. Therefore, he is not entitled to federal habeas corpus relief on this issue.

### D.   Prosecutorial Misconduct

Harris argues that the prosecution engaged in the following acts of misconduct: (a) characterizing him throughout the course of the trial as "the Twilight Rapist"; (b) withholding or suppressing material, exculpatory evidence that was favorable to the defense; and (c) using "scare-tactics" by threatening to taser/shock Harris for his irrational and bizarre behavior during trial.[115]   These claims, which are addressed briefly below, are without merit.

### 1.   References to the Twilight Rapist

Harris complains that the prosecutor violated his rights by making improper comments about him, characterizing him as the Twilight Rapist throughout his trial. Improper comments by a prosecutor during a state court trial do not violate the Constitution unless they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

Contrary to Harris's contention that the prosecutor referred to him as the Twilight Rapist throughout the trial, the record shows that the prosecutor did so on

---

[115]   Petition [Doc. # 1] at 6.  Harris also alleges the suppression of material exculpatory evidence as a separate claim for "wrongful process of law."  *Id.* at 8.

only two occasions.   The first reference was made during voir dire when the prosecutor asked whether any of the prospective jurors had heard any pretrial publicity about the case.[116]   The second reference was made during closing argument of the punishment phase of the trial in response to the defense's use of the term.[117]

The Fifth Circuit has cautioned that a prosecutor's remarks may not be considered in isolation when reviewing a claim of misconduct:

> [F]ederal courts may not, in a habeas corpus proceeding, impose the same standards upon state prosecutors that they apply to federal prosecutors in case on direct appeal. The prosecutor's remarks do not present a claim of constitutional significance unless they were so prejudicial that [petitioner's] state court trial was rendered fundamentally unfair within the meaning of the [F]ourteenth [A]mendment.  There is such unfairness only if the prosecutor's remarks evince "either persistent and pronounced misconduct or . . . the evidence was so insubstantial that (in probability) but for the remarks no conviction would have occurred."  When thus attacked, prosecutorial comments are not considered in isolation, but are evaluated in the context of the entire trial as a whole including the prosecutor's entire closing argument.

*Kirkpatrick v. Blackburn*, 777 F.2d 272, 281 (5th Cir. 1985) (citations omitted);  *see also Rushing v. Butler*, 868 F.2d 800, 807 (5th Cir. 1989).   The trial of this case, which commenced on September 12 and concluded on September 30, 2011, lasted over two weeks.   The prosecutor's remarks, which were limited to two isolated references, were not persistent or pronounced.   Given the overwhelming volume and character of the evidence against Harris, the remarks did not constitute "a crucial, critical, highly significant factor in the jury's determination of guilt" or punishment.  *Whittington v. Estelle*, 704 F.2d 1418, 1422 (5th Cir. 1983) (citations omitted).  Harris

---

[116]     Reporter's Record, vol. 3 [Doc. # 5-13] at 80.

[117]     Reporter's Record, vol. 13 [Doc. # 6-11], at 12, 82.

does not otherwise establish that these isolated references rendered the proceeding fundamentally unfair or were so egregious as to violate the Constitution. *See, e.g., Menzies v. Procunier*, 743 F.2d 281, 288-89 (5th Cir. 1984) (noting that "a prosecutor's improper argument will . . . exceed constitutional limitations in only the most 'egregious cases'") (quoting *Houston v. Estelle*, 569 F.2d 372, 382 (5th Cir. 1978)).  As such, Harris has not shown that the state court unreasonably denied this claim or that he is entitled to federal habeas corpus relief.

### 2.    Withholding Exculpatory Evidence

Harris contends that the prosecutor violated his rights by withholding exculpatory evidence.  The State violates Due Process when it withholds evidence favorable to the accused where the evidence is material to guilt or to punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  To establish a *Brady* violation, a defendant must prove that: (1) the evidence was favorable to the defendant, either because it was exculpatory or because it has impeachment value; (2) the evidence was withheld or suppressed by the prosecutor, either willfully or inadvertently, and (3) the evidence was material such that prejudice ensued.  *See Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Kyles v. Whitley*, 514 U.S. 419, 432-33 (1995).  Evidence is material under *Brady* when there is a "reasonable probability" that the outcome of the trial would have been different if the suppressed evidence would have been disclosed to the defendant.  *Wood v. Bartholomew*, 516 U.S. 1, 5 (1995).

Harris appears to claim that the State suppressed a "Profile Report" that was prepared by the Federal Bureau of Investigation.[118]  Harris does not provide a copy of

---

[118]    Petition [Doc. # 1], at 15.

the Profile Report or allege facts showing that it was favorable to the defense.[119] Assuming that the Profile Report was not disclosed, Harris does not show that the result of the trial would have been different if the report had been disclosed to the defense.  Because Harris does not demonstrate that the evidence was material, he fails to establish a *Brady* violation with respect to the Profile Report.  Harris does not otherwise show that the state court unreasonably denied relief on this claim or that he is entitled to federal habeas corpus relief.

### 3.    Threats to Taser/Shock

Harris contends that the prosecutor violated his rights by threatening him with a taser or electric shock. Although he provides no details in support of this claim, Harris presumably refers to the Bandit security device that he was ordered to wear during court appearances.

The record reflects that the trial court ordered Harris to wear a remotely controlled electronic Bandit device during trial based on Harris's repeated acts of misbehavior.[120]  The bailiff had the only trigger to the device.[121]  Harris was not fitted

---

[119]    The record reflects that a task force was formed, including the Texas Rangers, the Federal Bureau of Investigation, and local law enforcement from several counties, to address the rash of burglaries and sexual assaults perpetrated by Harris.  *See* Reporter's Record, vol. 12 [Doc. # 6-9] at 24 (describing the task force).  It is not clear from the record, but the Profile Report referenced by Harris may have been produced as part of that task force.

[120]    Reporter's Record, vol. 3 [Doc. # 5-13], at 6-7.

[121]    *Id.*

26

with the device at the prosecutor's request.[122] Harris does not point to any evidence showing that the prosecutor threatened him in any way and the Court's own review of the record does not disclose any.  Because Harris's conclusory allegation does not state a claim, *see Ross*, 694 F.2d at 1012, he is not entitled to relief on this issue.

## E.   Ineffective Assistance of Trial Counsel

Harris alleges that he was denied effective assistance of counsel prior to and during his trial.[123]  Claims of ineffective assistance of counsel are analyzed under the well-established standard set forth in *Strickland v. Washington*.  *See, e.g., Williams v. Stephens*, 761 F.3d 561, 566 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 1735 (2015) (identifying *Strickland* as the clearly established precedent governing ineffective-assistance claims).  To prevail under the *Strickland* standard, a defendant must demonstrate both constitutionally deficient performance by counsel and actual prejudice as a result of the alleged deficiency.  *See Williams v. Taylor*, 529 U.S. 390, 390-91 (2000).  "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that rendered the result unreliable."  *Strickland*, 466 U.S. at 687.

"To satisfy the deficient performance prong, 'the defendant must show that counsel's representation fell below an objective standard of reasonableness.'" *Hoffman v. Cain*, 752 F.3d 430, 440 (5th Cir. 2014) (quoting *Strickland*, 466 U.S. at 688), *cert. denied*, 135 S. Ct. 1160 (2015).  This is a "highly deferential" inquiry; "[t]here is 'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'"  *Id.* (quoting *Strickland*, 466 U.S. at 689) (internal quotation marks omitted).  "To satisfy the prejudice prong, '[t]he defendant

---

[122]    *Id.* at 4-9.

[123]    Petition [Doc. # 1], at 6-7.

must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"   *Id.* (quoting *Strickland*, 466 U.S. at 694).

Because Harris's ineffective-assistance claims were rejected on state habeas review, the central question is not whether this court "'believes the state court's determination' under the *Strickland* standard 'was incorrect but whether the determination was *unreasonable* — a substantially higher standard.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 478 (2007)) (emphasis added).  In addition, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Id.*  When applied together with the highly deferential standard found in 28 U.S.C. § 2254(d), review of ineffective-assistance claims is "doubly deferential" on habeas corpus review.  *Knowles*, 556 U.S. at 123; *see also Richter*, 562 U.S. at 105 (emphasizing that the standards created by *Strickland* and § 2254(d) are both "highly deferential," and "'doubly' so" when applied in tandem) (citations and quotations omitted);  *Beatty v Stephens*, 759 F.3d 455, 463 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 2312 (2015) (same).  Harris's allegations of ineffectiveness are examined separately below under this standard.

### 1.   Failure to Object to "Criminal Label"

Harris contends that his defense attorney was deficient for failing to file a motion to exclude or object to "Ref. 'Criminal Label.'"[124]  Harris does not elaborate or explain what he means and he provides no details in support of this contention.  A conclusory allegation of ineffectiveness is insufficient to demonstrate deficient

---

[124]     Petition [Doc. # 1], at 6.

performance or actual prejudice.  *See Day v. Quarterman*, 566 F.3d 527, 540-41 (5th Cir. 2009).  Without any supporting facts, this claim presents nothing to review.

Assuming for the sake of argument that Harris contends that his defense attorney failed to object when the prosecutor made reference to the Twilight Rapist during trial, he does not demonstrate that counsel was deficient.  As noted above, the prosecutor made reference to the Twilight Rapist on only two occasions:  once during voir dire and once again during closing arguments in the punishment phase of trial.[125] Harris has not established that the prosecutor violated his rights for reasons discussed previously. Viewing the comments in context, Harris does not otherwise demonstrate that defense counsel had a non-frivolous objection to make.  *See Green v. Johnson*, 160 F.3d 1029, 1037 (5th Cir. 1998) ("[F]ailure to make a frivolous objection does not cause counsel's performance to fall below an objective level of reasonableness . . . .").  Under these circumstances, Harris does not demonstrate that his counsel was ineffective for failing to object.

### 2.    Creating Pretrial Publicity

Harris contends that his defense attorney was deficient for creating pretrial publicity by referring to him as the "Twilight Rapist" in a newspaper advertisement.[126] The advertisement, which was placed in the "Jackson County Herald Tribune" on Wednesday, February 16, 2011, invited readers to provide a "confidential" opinion during a "community survey."[127] Counsel placed the advertisement to solicit opinions

---

[125]    Reporter's Record, vol. 3 [Doc. # 5-13] at 80; Reporter's Record, vol. 13 [Doc. # 6-11], at 12, 82.

[126]    Petition [Doc. # 1], at 6-7;  Petitioner's Memorandum [Doc. # 1-1], at 3-7.

[127]    Petition [Doc. # 1], at Exhibit A.

from the public about whether his client could get a fair trial in Jackson County.[128] Concerned about the possibility of prejudice, the trial court ordered defense counsel to stop running the advertisement.[129]

Counsel's decision to place the advertisement was plainly strategic. Strategic decisions made by defense counsel are entitled to substantial deference in the hindsight of federal habeas review. *See Strickland*, 466 U.S. at 689 (emphasizing that "[j]udicial scrutiny of counsel's performance must be highly deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight"). A federal habeas corpus court may not find ineffective assistance of counsel merely because it disagrees with counsel's chosen trial strategy. *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir. 1999). It is well established in this circuit that "[a] conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997); *Garland v. Maggio*, 717 F.2d 199, 206 (5th Cir. 1983) (citing *Fitzgerald v. Estelle*, 505 F.2d 1334 (5th Cir. 1975); *Daniels v. Maggio*, 669 F.2d 1075 (5th Cir. 1982)).

Defense counsel vigorously defended his strategy at a pretrial hearing.[130] Counsel emphasized that he was using the advertisement solely to assist his investigation regarding potential prejudice against his client in the community and to

---

[128]   Reporter's Record, vol. 2 [Doc. # 5-11], at 12-16.

[129]   *Id*. at 17-18.

[130]   Reporter's Record, vol. 2 [Doc. # 5-11], at 12-18.

determine whether a change of venue was necessary.[131]   Counsel also noted that the case had already garnered extensive publicity in much larger media markets,[132] and that the local paper had a very limited circulation in comparison.[133]   The advertisement, placed in February of 2011, preceded the September 2011 trial by more than six months.  Both the prosecution and the defense questioned jurors during voir dire about whether they could put aside anything they had read or heard about the case and base their decision on the facts and the law.[134]   None of the potential jurors indicated that pretrial publicity would influence their verdict or that they could not be fair and impartial based on something they had read prior to the trial.[135]  Harris does not show that the small local advertisement placed by defense counsel was any more inflammatory than other more widely publicized media accounts of Harris's crime spree or that it had any effect on the jury's verdict.[136]   Under these circumstances, Harris does not show that his counsel was deficient for placing the advertisement or that he was prejudiced as a result.  Thus, he does not demonstrate that the state court's decision to deny relief was contrary to, or involved an unreasonable application of, the *Strickland* standard.

### 3.    Failure to Investigate or Call a Qualified Expert Witness

---

[131]    *Id.* at 13-14.

[132]    *Id*. at 12-13.

[133]    *Id.* at 15.

[134]    Reporter's Record, vol. 3 [Doc. # 5-13], at 80-82; [Doc. # 5-14], at 13-14, 16-18.

[135]    Reporter's Record, vol. 3 [Doc. # 5-13], at 82;  [Doc. # 5-14], at 18.

[136]    Reporter's Record, vol. 2 [Doc. # 5-11], at 12 (listing some of the media accounts).

Harris contends that his defense attorney failed to properly investigate or determine whether testimony proffered by the defense expert witness on MPD/DID (Dr. Ross) was "sufficiently relevant and adequately reliable."[137]  Harris contends further that defense counsel failed to investigate or question the defense expert witness's credentials and expertise with regard to MPD/DID.[138]  Noting that the trial court excluded the expert testimony on MPD/DID, Harris argues that his defense counsel was ineffective for failing to call a qualified expert on the subject.

The record reflects that Dr. Ross's credentials were substantial.[139]  A specialist in dissociative disorders, Ross was on the "dissociative committee" of experts listed in the then-current version of the Diagnostic and Statistical Manual of Mental Disorders - Fourth Edition ("DSM-IV") of the American Psychiatric Association.[140]  At the time of trial in 2011, Ross had written over 150 papers in peer-reviewed journals and a series of books on dissociative disorders.[141]  Harris does not allege what further investigation would have revealed and he does not demonstrate that his counsel was deficient for failing to investigate Dr. Ross's qualifications.  Based on this record, counsel's decision to call Dr. Ross as an expert is "virtually unchallengeable."  *Hinton v. Alabama*, — U.S. —, 134 S. Ct. 1081, 1089 (2014) (observing that selection of an expert witness is a strategic choice).

---

[137]    Petition [Doc. # 1], at 7.

[138]    *Id.*

[139]    Reporter's Record, vol. 7 [Doc. # 5-20], at 29-

[140]    *Id.* at 31-32 (the DSM-5 was not published until after the trial in 2013).

[141]    *Id.*

To the extent that Harris contends that his counsel should have called a more qualified expert, Harris does not identify any potential expert witness who was more qualified on the subject of MPD/DID than Dr. Ross.  The Fifth Circuit has emphasized that "[c]laims of uncalled witnesses are disfavored, especially if the claim is unsupported by evidence indicating the witnesses's willingness to testify and the substance of the proposed testimony." *Gregory v. Thaler*, 601 F.3d 347, 353 (5th Cir. 2010) (citing *Harrison v. Quarterman*, 496 F.3d 419, 428 (5th Cir. 2007)); *see also Sayre v. Anderson*, 238 F.3d 631, 635-36 (5th Cir. 2001) (same) (citations omitted). Absent a showing that another, more qualified expert was would have testified favorably for the defense, Harris fails to establish that he was prejudiced.  *See Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002).  Because Harris fails to otherwise show that the state court's decision to deny relief was unreasonable, he is not entitled to relief on this claim.

### 4.   Failure to Investigate or Call a Witness from the Veteran's Administration

Harris also contends that his defense attorney was deficient for failing to investigate whether Harris was entitled to an expert witness on PTSD through the Veteran's Administration ("VA").[142] Harris, whose military career did not include combat duty, does not show that he has been diagnosed with PTSD or that he would have been entitled to an expert through the VA if his defense counsel had asked. Harris's conclusory allegations are insufficient to demonstrate deficient performance or actual prejudice.  *See Day*, 566 F.3d at 540-41; *see also Lincecum v. Collins*, 958 F.2d 1271, 1279 (5th Cir. 1992) (denying habeas relief where petitioner "offered nothing more than the conclusory allegations in his pleadings" to support claim that

---

[142]      *Id.*

counsel was ineffective for failing to investigate and present evidence).  Therefore, Harris fails to establish that his counsel was ineffective for failing to call an expert witness from the VA or that the state court erred in denying this claim under *Strickland*.

### 5.      Failure to Obtain a Ruling on Admissibility

Harris contends that his defense attorney was deficient for failing to obtain a "pre-admission determination" outside the presence of the jury before offering scientific evidence about MPD/DID.[143]  Harris does not demonstrate that the expert testimony on MPD/DID would have been admitted if defense counsel had sought a ruling prior to trial.  By presenting the evidence without a ruling in advance, the jury was able to hear extensive testimony from Dr. Quijano and Dr. Ross about Harris's symptoms of mental illness.[144]  Defense counsel's strategy of presenting the evidence in this manner is entitled to substantial deference and is exempt from judicial second-guessing on federal habeas review.  *See Strickland*, 466 U.S. at 689.  Harris does not otherwise demonstrate that his trial was rendered unfair as a result of counsel's strategic decision.  Because Harris fails to establish deficient performance or actual prejudice, he does not show that he was denied effective assistance of counsel with respect to the presentation of expert testimony in his case.

### 6.      Competency to Stand Trial

Harris contends that his defense attorney was deficient for failing to file a motion for a jury finding on the issue of his competency to stand trial under Article 46B.051(a) of the Texas Code of Criminal Procedure or to have an independent

---

[143]      Petition [Doc. # 1], at 7.

[144]      Reporter's Record, vol. 7 [Doc. # 5-20], at 10-78.

Case 6:15-cv-00034   Document 19   Filed in TXSD on 06/29/16   Page 35 of 44

examination for a competency determination.[145]  The record refutes this claim.  As noted above, defense counsel retained Dr. Quijano, who examined Harris for six hours and determined that he was competent.[146]  The trial court also authorized an examination of Harris's competency by an independent expert (Dr. Kutnick).[147]  Harris does not demonstrate that he was incompetent to stand trial or that his counsel failed to have him evaluated.  Under these circumstances, Harris does not show that he received ineffective assistance of counsel with respect to his competency to stand trial.

### 7.      Failure to Object to Trial Court Orders

Harris contends that his defense attorney was deficient for failing to object to the trial court's directives for Harris not to remove his earplugs.[148]  Harris contends

---

[145]      Petition [Doc. # 1], at 7.

[146]      Reporter's Record, vol. 7 [Doc. # 5-20], at 73.

[147]      Reporter's Record, vol. 2 [Doc. # 5-11], at 18-19; Order for Incompetency Examination [Doc. # 4-15], at 11;  Invoice [Doc. # 4-16], at 7; and Notice of Filing [Doc. # 4-16], at 10.

[148]      Petition [Doc. # 1], at 7.

further that his defense attorney was deficient for failing to object to the trial court's order to have Harris tried while hand-cuffed in the presence of the jury.[149]

This claim concerns Harris's conduct during trial.  As noted above, the trial court ordered Harris to be placed in restraints due to his record of repeated outbursts, which included altercations with courtroom security personnel.[150]  Harris's bizarre behavior continued during the trial, where he attempted to present insanity as a defense.  Harris insisted on testifying with ear plugs or tissue stuffed in his ears.[151] Harris explained that the ear plugs were necessary to keep one or more of his multiple personalities "inside."[152]  When defense counsel asked him to remove the tissue, Harris became agitated and had to be restrained by courtroom deputies.[153]  The trial court immediately called a recess because of Harris's "theatrics" and instructed defense counsel not to ask Harris to remove the earplugs again.[154]

A trial judge has discretion to order that an obstreperous defendant be shackled and handcuffed during a jury trial.  *See Illinois v. Allen*, 397 U.S. 337, 343-44 (1970) (opining that trial judges "must be given sufficient discretion" to ensure the "dignity, order, and decorum . . . of all court proceedings" and concluding that binding and gagging an obstreperous defendant is constitutionally acceptable in some situations). The Supreme Court has recognized that "judges must seek to maintain a judicial

---

[149]    *Id.*

[150]    Reporter's Record, vol. 3 [Doc. # 5-13], at 4-9; ; Reporter's Record, vol. 12 [Doc. # 6-10] at 45.

[151]    Reporter's Record, vol. 6 [Doc. # 5-18], at 73.

[152]    *Id.*

[153]    *Id.* at 75.

[154]    *Id.* at 76.

process that is a dignified process" and that in certain circumstances there will be cases in which the "perils of shackling are unavoidable." *Deck v. Missouri*, 544 U.S. 622, 631, 632 (2005).

In this instance, the trial court specifically found that Harris's repeated acts of misconduct warranted the use of an electronic security device, and that restraints were necessary for the safety of those surrounding Harris during all courtroom proceedings.[155]  The record reflects that defense counsel lodged objections in writing about the use of the Bandit security device and the imposition of visible restraints before the start of trial, requesting that restraints be used in a discrete manner if necessary.[156]  Taking into consideration Harris's record of courtroom outbursts, Harris does not demonstrate that the trial court abused its discretion to ensure proper courtroom decorum and safety.[157]  Harris does not otherwise show that his counsel had a valid objection to make or that his counsel was deficient in the way he handled this situation.  *See Parr v. Quarterman*, 472 F.3d 245, 256 (5th Cir. 2006) (holding that counsel was not deficient in failing to present a meritless argument) (citation omitted); *Wilkins v. Stephens*, 560 F. App'x 299, 314 (5th Cir. 2014) (finding that any objection to the defendant's restraints would have been futile).

Likewise, Harris does not demonstrate actual prejudice in connection with the alleged failure to object by defense counsel.  In that regard, the facts at trial pointed

---

[155]    Reporter's Record, vol. 3 [Doc. # 5-13], at 4-9.

[156]    Objection Regarding Bandit Restraint System [Doc. # 4-18], at 3.

[157]    Harris does not raise a separate claim faulting the trial court's decision to require restraints and shackles in front of the jury.  Even if he did, such a claim would be without merit here.  *See Hatten v. Quarterman*, 570 F.3d 595, 604 (5th Cir. 2009) (finding that the use of visible restraints, even if erroneous, was harmless in view of the overwhelming evidence against the defendant).

overwhelmingly to Harris's guilt, so that even the most competent attorney would be unlikely to have obtained a different result.  *See Creel v. Johnson*, 162 F.3d 385, 396 (5th Cir. 1998) (citing *Wilkerson v. Whitley*, 16 F.3d 64, 68 (5th Cir. 1994)); *see also Tamez v. Thaler*, 344 F. App'x 897, 899-90 (5th Cir. 2009) (finding no prejudice by counsel's alleged failure to object to the defendant being tried in restraints where the evidence against him was overwhelming).  Under these circumstances, Harris does not demonstrate that the state court's decision to deny relief was contrary to, or involved an unreasonable application of, the *Strickland* standard.    Accordingly, he is not entitled to relief.

### F.    Ineffective Assistance of Counsel on Appeal

Harris contends that he was denied effective assistance of counsel on appeal because his appellate attorney did not raise meritorious claims of ineffective assistance of counsel concerning his trial attorney.[158]  A claim of ineffective assistance on appeal is governed by the above-referenced test set out in *Strickland*, which requires the defendant to establish both constitutionally deficient performance and actual prejudice.  *See Smith v. Murray*, 477 U.S. 527, 535-36 (1986) (applying *Strickland* to a claim of ineffective assistance of counsel on appeal).  To establish that appellate counsel's performance was deficient in the context of an appeal, the defendant must show that his attorney was objectively unreasonable in failing to find arguable issues to appeal — that is, that counsel unreasonably failed to discover non-frivolous issues and raise them.  *Smith v. Robbins*, 528 U.S. 259, 285 (2000). If the defendant succeeds in such a showing, then he must establish actual prejudice by demonstrating a "reasonable probability" that, but for his counsel's deficient performance, "he would have prevailed on his appeal."  *Id.*

---

[158]    Petition [Doc. # 1], at 9.

The record shows that Harris's appellate counsel reviewed the record and elected to raise an issue concerning the trial court's decision to exclude expert testimony on MPD/DID.[159] Harris does not demonstrate that his appellate counsel was deficient in the way that he presented this claim. Because the record is frequently undeveloped, habeas corpus, rather than direct appeal, is the preferred method for raising claims of ineffective assistance of counsel. *See Massaro v. United States*, 538 U.S. 500, 5004-05 (2003); *see also United States v. Navejar*, 963 F.2d 732, 735 (5th Cir. 1992) (explaining that allegations of ineffective-assistance are resolved on direct appeal only in "rare" cases in which the record allows a fair evaluation of the merits of the claim); *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002) (explaining that habeas review is preferred because "[i]n the majority of cases, the record on direct appeal is simply undeveloped and cannot adequately reflect the failings of trial counsel"). To the extent that Harris contends that ineffective-assistance claims should also have been presented on appeal, he does not demonstrate that any of his claims had merit. Harris does not show that his appellate counsel was deficient and he further fails to establish that the result of his appeal would have been different if his attorney had raised any of the claims outlined in his petition. Thus, Harris fails to show that the state court's decision to reject this claim was unreasonable or wrong and he is not entitled to federal habeas relief on this issue.

### G.   Errors on State Habeas Review

Harris contends that the Texas Court of Criminal Appeals abused its discretion by denying his motion to exceed prescribed page limits on state habeas corpus

---

[159]   Brief of Appellant [Doc. # 10-4].

review.[160]  Harris claims further in his supporting memorandum that the state habeas corpus court erred by not holding an evidentiary hearing on his ineffective-assistance claims.[161]

It is well established in this circuit that "infirmities" or errors that occur during state collateral review proceedings "do not constitute grounds for relief in federal court." *Trevino v. Johnson*, 168 F.3d 173, 180 (5th Cir. 1999);  *see also Morris v. Cain*, 186 F.3d 581, 585 n.6 (5th Cir. 1999);  *Hallmark v. Johnson*, 118 F.3d 1073, 1080 (5th Cir. 1997);  *Nichols v. Scott*, 69 F.3d 1255, 1275 (5th Cir. 1995 (citations omitted).  Instead, a habeas corpus petitioner must demonstrate "constitutional error at the trial or direct review" before a federal court may issue the writ.  *Morris*, 186 F.3d at 585 n.6.  Harris, who does not allege facts showing how he was harmed by the page limits imposed or the lack of an evidentiary hearing on state habeas review, has not demonstrated a constitutional violation here and he does not show that these claims warrant relief.

Because Harris has failed to establish a valid claim for relief in this case, the respondent's motion for summary judgment will be granted and the petition will be dismissed.

## IV.    PETITIONER'S MOTION FOR LEAVE TO AMEND

After the respondent filed a motion for summary judgment, Harris requested leave to amend his petition to add new allegations that his defense counsel was ineffective for failing to investigate and present evidence in support of an insanity

---

[160]    Petition [Doc. # 1], at 10.

[161]    Petitioner's Memorandum [Doc. # 1-1], at 1-2.

defense.[162]  Harris alleges further that the prosecutor violated *Brady* by suppressing "mitigating" evidence that he suffered from a mental illness.[163]  The motion will be denied for reasons stated briefly below.

The federal rules dictate that leave to amend shall be "freely" given when justice so requires. FED. R. CIV. P. 15(a)(2);  *Foman v. Davis*, 371 U.S. 177, 182 (1962). However, a district court does not abuse its discretion when it denies leave to amend because the amendment would be futile.  *See Stripling v. Jordan Prod. Co.,* 234 F.3d 863, 872 (5th Cir. 2000).  An amendment is futile if it would "fail to state a claim upon which relief could be granted." *Id.*

The record reflects that Harris did not raise his proposed claims in state court. As a result, his unexhausted allegations are barred from review by the doctrine of procedural default.  *See Garza v. Stephens*, 738 F.3d 669, 675 (5th Cir. 2013).  More importantly, the proposed claims are without merit.

Harris provides no facts in support of his claim that his defense counsel was deficient for failing to investigate or present evidence in support of the defense of insanity.  A habeas corpus petitioner who alleges a failure to investigate on the part of his counsel must state with specificity what the investigation would have revealed and how it would have changed the outcome of his trial.  *See Miller v. Dretke*, 420 F.3d 356, 361 (5th Cir. 2005) (citing *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989)).  The record reflects that defense counsel strenuously pursued an insanity defense on Harris's behalf, presenting testimony from Harris and two experts for that

---

[162]     Motion for Leave to Amend [Doc. # 18], at 1.

[163]     *Id.*

purpose.[164] Harris does not provide details showing what more his counsel could have done or how it would have made a difference.  His conclusory allegations are insufficient to state an actionable ineffective-assistance claim.  *See Lincecum*, 958 F.2d at 1279.

Likewise, Harris also fails to present any facts in support of his proposed claim under *Brady*.  Harris does not identify what evidence was supposedly withheld or show that it was material in character; nor does he prove that anything was in fact suppressed.  The record reflects that Harris was examined by three experts who testified at trial regarding Harris's mental state (Dr. Quijano, Dr. Ross, and Dr. Coons).  Harris was also examined by an independent expert (Dr. Kutzner), who prepared a written report at the trial court's request.  Based on this record, Harris's bare allegation that evidence of a mental illness was withheld is insufficient to establish a *Brady* violation.  *See Murphy v. Johnson*, 205 F.3d 809, 814 (5th Cir. 2000) ("Allegations that are merely 'conclusionary' or are purely speculative cannot support a *Brady* claim.").

Because the claims proposed by Harris are without merit, leave to amend would be futile.  Accordingly, Harris's motion to amend the petition to include these claims will be denied.

## V.   CERTIFICATE OF APPEALABILITY

Rule 11 of the Rules Governing Section 2254 Cases requires a district court to issue or deny a certificate of appealability when entering a final order that is adverse

---

[164]   In his supporting memorandum, Harris alleges further that his trial counsel was ineffective for failing to raise and file a notice of intent to raise, the insanity defense. *See* Petitioner's Memorandum [Doc. # 1-1], at 4, 5.  This was not presented as a claim on state habeas review and is procedurally barred.  Alternatively, it is without merit as the record includes a written notice of intent to present evidence of insanity as required by Texas law. *See* Notice of Intent:  Insanity Defense [Doc. # 4-18], at 4.

to the petitioner.  A certificate of appealability will not issue unless the petitioner makes "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), which requires a petitioner to demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).  Under the controlling standard, this requires a petitioner to show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).  Where denial of relief is based on procedural grounds, the petitioner must show not only that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right," but also that they "would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

A district court may deny a certificate of appealability, *sua sponte*, without requiring further briefing or argument.  *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).  After careful review of the pleadings and the applicable law, the Court concludes that reasonable jurists would not find the assessment of the constitutional claims debatable or wrong.  Because the petitioner does not otherwise allege facts showing that his claims could be resolved in a different manner, a certificate of appealability will not issue in this case.

## VI.  CONCLUSION

Based on the foregoing, the Court **ORDERS** as follows:

1. The respondent's motion for summary judgment [Doc. # 17] is **GRANTED**.

2.      The petitioner's motion for leave to amend [Doc. # 18] is **DENIED**.

3.      The federal habeas corpus petition is **DENIED**, and this case is **DISMISSED** with prejudice.

4.      A certificate of appealability is **DENIED**.

The Clerk shall provide a copy of this order to the parties.

SIGNED at Houston, Texas, on June 29, 2016.

NANCY F. ATLAS
SENIOR UNITED STATES DISTRICT JUDGE